MITCHELL A. WEEMAN,    )
                       )
          Plaintiff,   )
                       )
     v.                )     2:18-cv-00278-JAW
                       )
LIFE INSURANCE COMPANY OF )
NORTH AMERICA,         )
                       )
          Defendant.   )

## ORDER ON MOTIONS FOR JUDGMENT ON THE RECORD

An insured under a long-term disability insurance policy brings this claim against his employer's disability insurer, arguing that the insurer unlawfully denied him benefits to which he was entitled under the policy. Both parties move for judgment on the administrative record. After reviewing the record and applying the arbitrary and capricious standard to the insurer's denial of disability benefits, the Court concludes that the insurer had a reasonable basis and sufficient evidence to support its denial of the insured's claim. The Court therefore grants the insurer's motion for judgment on the administrative record and denies the insured's motion.

## I.  BACKGROUND

### A.  Procedural History

On July 12, 2018, Mitchell A. Weeman filed a complaint against Life Insurance Company of North America (LINA) alleging that LINA—a provider of long-term disability insurance governed by the Employee Retirement Income Security Act (ERISA) through Mr. Weeman's employer, Brookfield Power US Holding America

Company (Brookfield)—acted arbitrarily and capriciously in denying Mr. Weeman's claim for such benefits. *Compl.* ¶¶ 5, 26-27 (ECF No. 1). LINA answered Mr. Weeman's Complaint on September 11, 2018. *Answer* (ECF No. 5). On October 10, 2018, LINA filed the Administrative Record for this case with the Court. *Letter to United States District Ct.* (ECF No. 8).

On November 28, 2018, both Mr. Weeman and LINA moved separately for judgment on the administrative record. *Mot. for J. on the Administrative R.* (ECF No. 9) (*Pl.'s Mot.*); *Def.'s Mot. for J. on the Administrative R.* (ECF No. 10) (*Def.'s Mot.*). Both parties filed statements of facts appended to their motions. *Pl.'s Mot.*, Attach. 1, *Pl.'s App. to Mot. for J. on the Administrative R.* (ECF No. 9) (*Pl.'s App. of Facts*); *Def.'s Mot.*, Attach. 1, *Def.'s App. of Facts* (ECF No. 10) (*Def.'s App. of Facts*). On December 12, 2018, Mr. Weeman responded to LINA's motion. *Pl.'s Objs. to Def.'s Mot. for J. on the Administrative R.* (ECF No. 11) (*Pl.'s Objs.*). On December 19, 2018, LINA responded separately to both Mr. Weeman's motion and statement of facts. *Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Administrative R.* (ECF No. 12) (*Def.'s Opp'n*); *Def.'s Reply to Pl.'s App. of Facts* (ECF No. 13). On December 27, 2018, Mr. Weeman replied to LINA's response to his motion. *Resp. to Def.'s Objs. to Pl.'s Mot. for J. on the Administrative R.* (ECF No. 14) (*Pl.'s Reply*). On January 4, 2019, LINA filed a motion to strike Mr. Weeman's reply. *Def.'s Mot. to Strike Pl.'s Reply Mem.* (ECF No. 15) (*Def.'s Mot. to Strike*).[1]

---

[1] The basis of LINA's motion to strike the Plaintiff's reply is that the Plaintiff filed his reply without first obtaining permission to do so in violation of the Magistrate Judge's scheduling order. *Def.'s Mot. to Strike* at 1. Mr. Weeman did not respond to LINA's motion to strike.

## B.    Statement of Facts

### 1.    The Parties

Brookfield employed Mr. Weeman as a senior production technician. *Administrative R.* at 1339. The overview of job responsibilities for this position states that "[t]he worker is responsible to operate the main and auxiliary generating equipment and machinery and other plant-related equipment; to perform predictive, preventive and reactive mechanical and electrical (limited to 600V) maintenance to the equipment and machinery; and to perform civil and structural maintenance and construction activities." *Id.* at 1337. This position, according to LINA's occupational analysis, required medium strength, *id.* at 1304, including "exerting 20 to 50 pounds of force occasionally, or 10 to 25 pounds of force frequently to move objects," as well as "significant walking or standing." *Def.'s App. of Facts* ¶ 21, n.1. Mr. Weeman worked his last day for Brookfield on February 28, 2015. *Administrative R.* at 3. He began receiving long-term disability benefits on August 29, 2015. *Id.* at 534-35.

LINA is a wholly-owned subsidiary of Connecticut General Corporation, itself a wholly-owned subsidiary of Cigna Corporation. *Def.'s Corporate Disclosure Statement* (ECF No. 6). LINA is the "named fiduciary" of Brookfield for "deciding claims for benefits" and "deciding any appeals of denied claims" under Brookfield's

---

LINA is correct that the Magistrate Judge's scheduling order, *Scheduling Order in Cases Under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B)* (ECF No. 7), states that "[n]o Reply Memoranda shall be filed without the prior permission of the Court." *Id.* at 3. In the District of Maine, "[t]he case management of all cases on the ERISA track shall be governed by the scheduling order." D. ME. LOC. R. 16.3(f)(2).

Here, in violation of the scheduling order, Mr. Weeman simply filed his reply without seeking prior permission and therefore, the Court GRANTS LINA's Motion to Strike Plaintiff's Reply Memorandum. (ECF No. 14).

"employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA")." *Administrative R.* at 1413.

## 2.     The Long-Term Disability Plan

Mr. Weeman was eligible to participate in the group policy of disability insurance issued by LINA to Brookfield under policy number FLK-960752 (Group Policy). *Def.'s Reply to Pl.'s App. of Facts* ¶ 3; *Administrative R.* at 1391-1415 (*Group Policy*). "All active, Full-time Maine Operating Services Employees of [Brookfield] regularly working a minimum of 30 hours per week and subject to a collective bargaining agreement" are eligible to receive benefits under the Group Policy. *Administrative R.* at 1393; *see also id.* at 1410. "Full-time means the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class." *Id.* at 1411.

LINA "will pay Disability Benefits if an Employee becomes Disabled while covered under [the Group Policy]. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy." *Id.* at 1400. "The Elimination Period is the period of time an Employee must be continuously Disabled before Disability Benefits are payable." *Id.* An employee is considered disabled under the Group Policy, and thus qualified to receive benefits, if, "solely because of Injury or Sickness, he or she is: 1. unable to perform the material duties of his or her Regular Occupation; or 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." *Id.* at 1394. "Regular Occupation" is defined as "[t]he occupation the

Employee routinely performs at the time the Disability begins." *Id.* at 1412. "Indexed

Earnings" are defined as follows:

> For the first 12 months Monthly Benefits are payable, Indexed Earnings will be equal to Covered Earnings. After 12 Monthly Benefits are payable, Indexed Earnings will be an Employee's Covered Earnings plus an increase applied on each anniversary of the date Monthly Benefits became payable. The amount of each increase will be the lesser of: 1. 10% of the Employee's Indexed Earnings during the preceding year of Disability; or 2. the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

*Id.* at 1411. "Covered Earnings" are defined as "an Employee's wage or salary as

reported by the Employer for work performed for the Employer as in effect just prior

to the date Disability begins. Covered Earnings are determined initially on the date

an Employee applies for coverage." *Id.* at 1394. "After Disability Benefits have been

payable for 24 months," the employee is considered disabled if:

> solely due to Injury or Sickness, he or she is: 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; or 2. unable to earn 60% or more of his or her Indexed Earnings.

*Id.* When claiming disability benefits, the claimant is required to "provide [LINA], at

his or her own expense, satisfactory proof of Disability before benefits will be paid."

*Id.* at 1400.

### 3. Mitchell A. Weeman's Short-Term Disability Claims

Mr. Weeman's relevant medical history begins with a total hip replacement he

received on September 19, 2013, due to his end-stage arthritis. *Id.* at 1442-45.

Following this procedure, Mr. Weeman filed a claim for short term disability benefits

which was approved on November 7, 2013. *Id.* at 623-24. The letter Mr. Weeman

received from LINA approving his claim stated that benefits would be paid through

December 11, 2013. *Id.* On September 26, 2014, Mr. Weeman received a left kidney nephrectomy to treat his renal cell carcinoma. *Id.* at 1423-25. On October 31, 2014, Mr. Weeman's short term disability benefits were approved through October 30, 2014. *Id.* at 609. On November 12, LINA sent a letter to Mr. Weeman notifying him that, because LINA had been informed he was "released to return to work as of October 23, 2014, therefore benefits [were] payable through October 22, 2014." *Id.* at 606.

Mr. Weeman stopped working on February 27, 2015, *id.* at 252, 589, in preparation for a March 2, 2015, biventricular ICD implantation to be performed by Dr. Charles M. Carpenter at the Maine Medical Center in Portland, Maine. *Id.* at 1328-30. An ICD is an "implantable cardioverter defibrillator." *Id.* at 1327. On March 10, 2015, Mr. Weeman visited Maine Medical Partners in Scarborough, Maine for a "routine wound check." *Id.* at 1351. Nurse Practitioner Anna Stasiv wrote in her notes that Mr Weeman had "tolerated the [March 2] procedure well without any complications" and that Mr. Weeman "state[d] that he is doing well." *Id.* Shortly thereafter, Mr. Weeman again applied for short term disability benefits[2] and on March 27, 2015, LINA approved his application for short term disability benefits though March 22, 2015. *Id.* at 586-87. In its letter approving Mr. Weeman's claim, LINA noted that Mr. Weeman's claim would remain open "through April 25, 2015 so that if [he was] not able to return to work by March 23, 2015, [he would] have an opportunity to send [LINA] the enclosed Medical Request Form completed for

---

[2] LINA states that Mr. Weeman "applied for disability benefits on March 17, 2015," citing pages 252-59 of the Administrative Record. *Def.'s App. of Facts.* While the cited portion of the Record states that the claim file was created on March 17, 2015, *Admin. R.* at 253, 259, it is not clear when Mr. Weeman made the underlying claim for benefits.

consideration of further benefits." *Id.* at 586.  On April 6, 2015, Dr. Carpenter wrote a letter stating that he had "explained to [Mr. Weeman] that he can no longer continue to work with electrical equipment" after the implantation of his ICD device, which was "for progressive heart disease." *Id.* at 1327.  On April 17, 2015, LINA sent Mr. Weeman a letter informing him that his eligibility for short term disability benefits would expire on July 26, 2015.  *Id.* at 563-64.  On April 30, 2015, Dr. Carpenter wrote a second letter stating that "Mr. Weeman has end-stage heart and kidney disease," and that he had told Mr. Weeman "that, under no circumstances, can he return to work as an electrician" due to his implanted defibrillator.  *Id.* at 1326.  On May 22, 2015, Mr. Weeman was seen by cardiologist Dr. Jeffrey Rosenblatt, who stated in his notes that Mr. Weeman was "doing well since his ICD BiV placement." *Id.* at 1323-25.

### 4.    Mitchell A.  Weeman's Long-Term Disability Claim

On June 29, 2015, LINA created a long-term disability claim file for Mr. Weeman.  *Id.* at 3, 5.  On July 3, 2015, the Social Security Administration awarded Mr. Weeman Social Security disability benefits, which he received from October 21, 2015, until November 16, 2016.  *Id.* at 1218, 1278.  On July 9, 2015, LINA conducted an occupational analysis of Mr. Weeman's position as an auxiliary equipment operator and concluded that the position required medium strength, frequent climbing and reaching, and occasional stooping, kneeling, crouching, and exposure to electrical shock.  *Id.* at 1303-04.  LINA confirmed approval of Mr. Weeman's long-term disability claim by letter dated August 12, 2015.  *Id.* at 534-35.  Benefits began

on August 29, 2015—after the 180-day elimination period following Mr. Weeman's March 2, 2015, date of disability. *Id.*

Dr. Rosenblatt saw Mr. Weeman again on November 19, 2015 and wrote that "Mr. Weeman is doing well from a cardiac standpoint. He is settling in to not working but does say he should probably find something else to do to keep him busy besides working on the 'honey-do list.' He denies chest pain, palpitations, or shortness of breath." *Id.* at 1295. Dr. Rosenblatt also wrote that Mr. Weeman "fe[lt] well, no change in exercise tolerance, weight gain of approximately 15 lbs." *Id.*

On April 1, 2016, Dr. James Wasserman, a nephrologist, saw Mr. Weeman for "Followup for Stage III Chronic Kidney Disease." *Id.* at 1112. Dr. Wasserman wrote:

> [Mr. Weeman] continues to have difficulty with loss of work. He is now very sedentary and not pursuing any particular activities. He is not walking, pursuing hobbies, or spending more time with friends. We talked about the importance of this for mental and physical health as well as social well-being. We put this in the context of his increased weight and increased fluid intake.

*Id.* Mr. Weeman saw Courtney Anson, a physician's assistant at Maine Medical Partners Urology, on April 27, 2016. *Id.* at 1078-80. The appointment was for follow-up on Mr. Weeman's renal cancer, and Ms. Anson found no evidence of recurrence. *Id.* at 1080.

Mr. Weeman returned to see Dr. Rosenblatt on May 6, 2016, and Dr. Rosenblatt noted that he was "doing well without any complaints of palpitations, shortness of breath, or chest pain." *Id.* at 906. "Th[e] conversation focused around diet and exercise." *Id.* Dr. Wasserman next saw Mr. Weeman on September 8, 2016, for further follow-up on his stage III chronic kidney disease. *Id.* at 1110. He denied

"[c]hest pain at rest" and "[c]hest pain with exertion." *Id.* at 1111. With regard to Mr. Weeman's congestive heart failure, Dr. Wasserman found "[n]o signs or symptoms of decompensation." *Id.*

On November 3, 2016, Mr. Weeman saw Ms. Anson because of a "Renal Mass."[3] *Id.* at 1165. Ms. Anson wrote that Mr. Weeman showed "[n]o evidence of recurrence" of his renal cancer. *Id.* at 1167. On November 4, 2016, Mr. Weeman again saw Dr. Rosenblatt, who stated that "Mr. Weeman feels well. There are no changes in his medical status. He remains on total disability due to the presence of the defibrillator and his working environment, which would contraindicate the use of an ICD in that environment." *Id.* at 903. Also, on November 4, 2016, Dr. Rosenblatt completed a "Disability Management Solutions Medical Request Form" stating that Mr. Weeman "[h]as an ICD Cannot work around Electrical current." *Id.* at 1163. Dr. Rosenblatt also wrote that Mr. Weeman "[c]annot work" and based on his experience would never be able to return to work. *Id.*

On December 6, 2016, Mr. Weeman completed a disability questionnaire that he received from LINA "[a]s part of [LINA's] evaluation of [Mr. Weeman's] claim and ongoing eligibility for disability benefits." *Id.* at 1215-16, 1219. In response to the question, "In your own words, tell us why you cannot work in your own or in any occupation," Mr. Weeman wrote, "Can not work in high magnetic fields; can no longer work with electrical equipment." *Id.* at 1216. In response to the question, "What is

---

[3]     LINA states that this visit was to Dr. Ellis Johnson, *Def.'s App. of Facts* ¶ 29, Mr. Weeman's primary care provider, but Ms. Anson wrote the notes for the visit, and there is no indication from the face of the record that the visit was with Dr. Johnson. *Administrative R.* at 1165-67.

primary physical and/or mental condition preventing you from working now," Mr. Weeman wrote "End stage heart and kidney disease. Also have an implanted defibrillator." *Id.* Mr. Weeman stated that he did one hour of yard work three days a week, a half hour of gardening once a week, an hour of reading seven days a week, and three hours of watching television seven days a week. *Id.* He also stated that he walked a half mile and used a computer every day, including "Windows" and "email." *Id.* As part of this questionnaire, Mr. Weeman signed a disclosure authorization form, authorizing his medical care providers to give LINA records related to his care. *Id.* at 1219.

On January 12, 2017, Mr. Weeman again saw Dr. Wasserman, who wrote that "[h]e continues to have difficulty with loss of work. He remains very sedentary. He continues to mourn previous lifestyle." *Id.* at 1108. Dr. Wasserman also noted that on that visit, Mr. Weeman was "not interested in following up in integrative nephrology clinic to discuss a more holistic approach to his health issues." *Id.* Dr. Wasserman further wrote that the "[m]ost important factor and correctable factor for [Mr. Weeman's] current health is increased activity, healthy diet, reduce caloric intake and weight reduction." *Id.* at 1109.

On March 8, 2017, Ms. Anson completed a "Disability Management Solutions Medical Request Form" stating that from her perspective, Mr. Weeman's renal cancer posed no work restrictions. *Id.* at 1194. On April 26, 2017, Dr. Wasserman returned to LINA a blank "Disability Management Solutions Medical Request Form" with a

note scrawled on the cover letter stating, "Per Dr. Wasserman, Please ask PCP or Cardiology to complete. Thanks." *Id.* at 1197-98.

### 5. Denial of Continued Long-Term Disability Benefits

After receiving twenty-four months of benefits payments as of August 29, 2017, it became Mr. Weeman's obligation to provide evidence that he was "1. unable to perform the material duties of any occupation for which he . . . is, or may reasonably become, qualified based on education, training or experience; or 2. unable to earn 60% or more of his . . . Indexed Earnings." *Id.* at 534, 1394.

On May 10, 2017, Dr. Shadrach Jones[4] completed an "Internal Resource Response" in which he "reviewed all available medical and/or vocational evidence, for which [he had] been trained, bearing on Disability and/or functional capacity and . . . considered its impact on the whole person in order to provide an accurate representation of the medical and/or vocational facts of the claim file." *Id.* at 110. Dr. Jones noted that "[t]he evaluation by Dr. Rosenblatt on 11/4/16 documented that customer [Mr. Weeman] presented for follow up reporting that he felt well denying dyspnea and chest pain," and that "[t]he examination by Courtney Anson, PA-C, on

---

[4]     The administrative record does not exactly reveal who Dr. Jones is nor do the parties clarify his role. He is identified in the May 10, 2017 Internal Resource Response as "Shadrach H. Jones, IV, M.D., Licensed Physician, Board Certification in Internal Medicine, Specialty Occupational and Environmental Medicine." *Administrative R.* at 111. The May 11, 2017 denial letter from David R., Disability Claim Manager, of CIGNA Group Insurance to Mr. Weeman, states:

> The information in your file was reviewed by our medical director (MD), who is a licensed physician Board Certified in internal medicine, and specializing in occupational and environmental medicine.

*Id.* at 469. The letter does not identify the name of the medical director. However, based on the uniformity of these two descriptions, the Court infers that Dr. Shadrach Jones was LINA's medical director.

11/3/16 documented that customer had a normal mental status, clear lungs, normal heart sounds, and no abdominal masses." *Id.* Dr. Jones concluded that "[t]he treating provider[']s opinion [that Mr. Weeman could not work] is not well supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the claim file" because "[t]he customer[']s cardiac disease would not preclude normal, sedentary activities," "[t]here is no current documentation of heart failure or syncope," and [t]here is no current documentation of symptoms at rest." *Id.* at 111. Dr. Jones wrote that while Mr. Weeman's "cardiomyopathy will limit aerobic capacity" and "[t]he implantable defibrillator must not be exposed to intense electromagnetic fields," Mr. Weeman is able to "frequently sit, reach at desk level, fine manipulate, simple grasp and firm grasp[,] occasionally stand, walk, and reach above the head and below the waist and lift, carry, push and pull 10 lbs. on an occasional basis and a negligible amount of weight on a frequent basis." *Id.*

Mr. Weeman saw Dr. Rosenblatt again on May 10, 2017. *Id.* at 899. Dr. Rosenblatt noted that "Mr. Weeman is doing relatively well. He does find he is short of breath when he exerts himself, but admits he has not really been doing much exercise outside." *Id.*

On May 11, 2017, Darci Bakos,[5] a Vocational Rehabilitation Specialist, completed a "Transferable Skills Analysis" (TSA) of Mr. Weeman, based in part on

---

[5] As with Dr. Jones, there is no clear indication of who Ms. Bakos is. The parties do not clarify her relationship with LINA. According to the Administrative Record, David Ruffenach referred Mr. Weeman's file to Ms. Bakos to perform a transferable skills analysis. *Administrative R.* at 1160. The May 11, 2017 denial letter says that LINA "had a certified vocational rehabilitation counselor perform

the disability questionnaire he filled out on December 6, 2016, and the medical review conducted by Dr. Jones on May 10, 2017. *Id.* at 1160-61. Ms. Bakos listed Mr. Weeman's skills and abilities as follows: "knowing the function of system specialty operated; directing work of others; coordination of eyes, hands, and fingers to run or adjust system; reading panel-board meter, dials, and gauges and using math skills to interpret readings; and remaining calm during emergencies." *Id.* at 1160. Ms. Bakos also noted that Mr. Weeman "uses a computer daily, with knowledge of Windows and email." *Id.* Based on Mr. Weeman's "skills, education attainment, work history, age, and wage requirements/station in life" and "based on [his] physical limitations and restrictions as outlined by Dr. Jones," Ms. Bakos stated her opinion that Mr. Weeman could work as a "Relay Record Clerk." *Id.* at 1161. Apart from the title, there is no description of what this position entails. While the TSA does state that such positions can be "perform[ed] in the labor market of Bar Mills, ME," it gives no indication that such positions were, indeed, available. *Id.*

Based on the TSA, LINA rejected Mr. Weeman's claim of continued disability by letter dated May 11, 2017. *Id.* at 468-70. Disability Claim Manager David R. wrote that Mr. Weeman was "not Disabled from any occupation as defined by" the Group Policy. *Id.* at 468, 470. David R. stated that Mr. Weeman's claim was reviewed by "[a] claim manager, medical director, vocational rehabilitation counselor, and

---

a transferable skills analysis to determine if suitable occupations exist that you should be qualified and able to perform based on your education, experience, and our MD's assessment of your work capacity as described above." *Administrative R.* at 469. Although Ms. Bakos may be employed by or contracted to LINA to perform transferable skills analyses, the Court cannot draw any conclusions on this Administrative Record about whether Ms. Bakos' relationship with LINA justifies consideration in the structural conflict analysis.

senior claim manager," who looked at "[t]he information in [Mr. Weeman's] file, including medical information from cardiologist Dr. Jeffrey Rosenblatt, urologist Dr. Matthew Hahn,[6] and nephrologist Dr. James Wasserman." *Id.* In a section entitled "How Was the Claim Decision Reached?," David R. wrote:

> Our review of your file shows that you have a history of congestive heart failure and renal cancer. Treatment is provided by Drs. Rosenblatt, Hahn, and Wasserman. We wrote to your physicians and requested copies of your medical records and completion of forms.
>
> Dr. Rosenblatt provided us with copies of your records through November 4, 2016, and completed a medical request form, on which he opined that you will never be able to return to work.
>
> Dr. Hahn provided us with copies of your records through November 3, 2016, and completed a medical request form, on which he indicated that no work restrictions were given to you.
>
> Dr. Wasserman advised that he defers to your cardiologist with regard to your work capacity.
>
> The information in your file was reviewed by our medical director (MD), who is a licensed physician Board Certified in internal medicine, and specializing in occupational and environmental medicine. When examined by Dr. Rosenblatt on November 4, 2016, you reported feeling well and denied dyspnea and chest pain. Your blood pressure was 124/56, pulse 66, and respirations 14. A grade III/IV systolic murmur was noted, but the rest of your examination was within normal limits. Your examination on November 3, 2016 documented that you had a normal mental status, clear lungs, normal heart sounds, and no abdominal masses. The MD noted that there is no documentation in your file of current heart failure, syncope, or symptoms at rest.
>
> The MD opined that your cardiac disease should not preclude sedentary work. Your implanted defibrillator should not be exposed to intense electromagnetic fields. The MD opined that you may frequently sit,

---

[6] It is unclear from the record whether this doctor's name is spelled "Hahn" or "Hayn." *Id.* at 1068. In any case, this doctor did not appear to consider that Mr. Weeman's urology issues were related to his disability claim. *Id.* (stating that "[t]his is not 'urology' issue for his Disability . . .."). As neither party has raised this doctor in their briefing, the Court defers to the doctor on the relevance of his opinion and records to this case.

reach at desk-level, fine manipulate, simple grasp and firm grasp occasionally; stand, walk, and reach above head and below the waist and lift, carry, push and pull ten pounds on an occasional basis and a negligible amount of weight on a frequent basis. There are no documented impairments of speech, hearing, vision, or cognition.

We had a certified vocational rehabilitation counselor perform a transferable skills analysis to determine if suitable occupations exist that you should be qualified and able to preform based upon your education, experience, and our MD's assessment of your work capacity as described above. We note that you completed high school and obtained an electrical license. You previously worked as a senior production technician, and report basic home computer use. A suitable sedentary occupations [sic] was identified that you should be qualified and able to perform: relay record clerk (D.O.T. 221.367-054).

The Dictionary of Occupational Titles defines sedentary work as follows: "*Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.*"

We are aware that you have been awarded Social Security Disability Insurance (SSDI) benefits by the Social Security Administration (SSA), and have considered that fact in our claim review. We have confirmed that there is no new information in your SSA file since the time of your initial Social Security Award. As a result, we are in receipt of more recent information than the SSA had to consider at the time of its decision.

We have identified a suitable sedentary occupation that you should be qualified and able to perform based upon your education, experience, and our MD's assessment of your work capacity. Therefore, you are not Disabled from any occupation and are not eligible for benefits beyond August 28, 2017.

*Id.* at 469. The letter went on to explain Mr. Weeman's options for appealing LINA's

determination. *Id.* at 469-70.

On May 16, 2017, Dr. Rosenblatt returned a second "Disability Management Solutions Medical Request Form," again stating that Mr. Weeman was "[u]nable to work" and could not return to work "in the near future." *Id.* at 1155. He did not provide further explanation for this conclusion.

### 6.    Michell A. Weeman's First Appeal

On June 7, 2017,[7] Mr. Weeman was seen by internist Dr. David Kispert[8] for "evaluation for disability insurance." *Id.* at 887. Dr. Kispert wrote that Mr. Weeman would "need additional evaluation and treatment prior to determining disability status" related to "complaints of arthritis in multiple joints . . .." *Id.* at 888. On June 20, 2017, Mr. Weeman was seen by nurse practitioner Chelsea Ginn,[9] who worked with Dr. Johnson, for "discussion of long-term disability." *Id.* at 889, 891. Ms. Ginn's exam found "normal ROM [range of motion] with flexion and extension" in his hands and "no evidence of erythema, edema, or warmth of the joints . . .." *Id.* at 890. On July 5, 2017, Mr. Weeman was seen by Dr. Ellis Johnson[10] for an annual physical exam. *Id.* at 676. While Dr. Johnson wrote that Mr. Weeman was "[i]n general . . . feeling OK," he went on to state that Mr. Weeman was "no longer able to work due to

---

[7]    LINA indicates that this visit took place on June 8, 2017, *Def.'s App. of Facts* ¶ 39, but the record indicates that it took place on June 7, 2017. *Administrative R.* at 887.

[8]    LINA says that Mr. Weeman "sought out" Dr. Kispert. *Def.'s Mot.* at 7. Dr. Kispert is listed as being affiliated with Maine Medical Center. *Administrative R.* at 887. Although the parties do not clarify Dr. Kispert's position and relationship to the parties, the Court infers that Dr. Kispert is not affiliated with LINA.

[9]    LINA also says that Mr. Weeman "sought out" Nurse Ginn. *Def.'s Mot.* at 7. Nurse Ginn is with Dr. Kispert's practice at Maine Medical Center. *Administrative R.* at 889. Although the parties do not clarify Nurse Ginn's position and relationship to the parties, the Court infers that Nurse Ginn is not affiliated with LINA.

[10]    In his motion for judgment, Mr. Weeman writes that Dr. Ellis Johnson had been his primary care physician since December 9, 2014. *Pl.'s Mot.* at 13. Dr. Johnson was affiliated with Maine Medical Center, *Administrative R.* at 676, and the Court infers that Dr. Johnson was not affiliated with LINA.

his ICD and diffuse osteoarthritis." *Id.* Dr. Johnson also wrote that Mr. Weeman was "not able to work at a computer due to his ongoing hand arthritis and has trouble sitting at a desk due to his back arthritis." *Id.* at 679.

On July 7, 2017, Mr. Weeman appealed LINA's rejection of continued disability benefits. *Id.* at 1151-52. Mr. Weeman wrote that he felt he was "unable to complete the required duties of a sedentary position, like" relay record clerk, because he did not "have proper keyboarding skills due to a combination of the osteoarthritis of both hands, inability to straighten one of [his] fingers, and improper technique," which he stated was a result of not knowing touch typing and only typing with his two index fingers, "which results in decreased productivity of [his] computer skills." *Id.* at 1151. Mr. Weeman went on to say that, while he had reported basic home computer use, his computer skills were "not up to the standard of your basic entry level worker," as his computer skills include only "minimum emailing, light browsing of web pages, and minimal typing in a word document." *Id.*

On July 18, 2017, Dr. Krystian Bigosinski[11] saw Mr. Weeman for a "Sports Medicine Initial Office Visit." *Id.* at 680. Dr. Bigosinski wrote that Mr. Weeman's "bilateral hand pain . . . could be coming from some osteoarthritic changes," stating that "[b]ilateral hands revealed diffuse swelling throughout all of the fingers and the right middle finger is especially swollen and tender. He is not able to extend the middle finger fully and . . . . [o]n both hands he cannot close his hands entirely and

---

[11]    The Administrative Record confirms that Dr. Bigosinski was an orthopedic surgeon affiliated with Maine Medical Center. *Administrative R.* at 680. The Court infers that Dr. Bigosinski was not affiliated with LINA.

make a fist due to swelling and pain." *Id.* at 680-81.  A "[l]imited ultrasound of the right middle finger did not reveal any pulsatile synovitis or any obvious erosive changes of the MCP, PIP, or DIP." *Id.* at 682.

On July 26, 2017, Mr. Weeman saw Dr. Johnson, who stated that "[t]oday Mitchell is really describing hand numbness from the wrist across the palms, some associated aching.  He denies specific joint erythema, warmth, or edema.  He has general puffiness of the hands.  They are stiff with full flexion.  He had a joint US [ultrasound] which showed no synovitis." *Id.* at 895.  In Dr. Johnson's view, "some of Mitchell's symptoms are related to carpal tunnel," and he "advised wrist braces at night, exercises provided." *Id.* at 896.

On August 9, 2017, Mr. Weeman received a diagnostic catheterization of his heart, which found "[m]ildly elevated left-sided filling pressure," "[n]o evidence of shunt on oximetry screen," and "[s]everely depressed Cardiac index . . .." *Id.* at 970. On that same day, Mr. Weeman received a transthoracic echocardiogram which found "severe diastolic dysfunction" and an ejection fraction of twenty-five percent.  *Id.* at 1053.

On August 15, 2017, Mr. Weeman saw neurologist Dr. John Belden[12] for an electromyogram (EMG) of his right hand, which "demonstrated a very severe conduction block in right median nerve at the wrist." *Id.* at 724.  Dr. Belden wrote that Mr. Weeman "clearly has bilateral carpal tunnel syndrome, in addition to some

---

[12]     The Administrative Record confirms that Dr. Belden was a neurologist affiliated with Maine Medical Center.  *Administrative R.* at 721.  The Court infers that Dr. Belden was not affiliated with LINA.

other musculoskeletal/arthritic hand discomfort problems." *Id.* Dr. Belden did not feel that Mr. Weeman was a candidate for surgical release from his symptoms because "other conditions besides carpal tunnel syndrome [we]re affecting his hands so carpal tunnel release would not necessarily make him more functional, as these would not improve the aching in the joints and other aches and pains in the hands." *Id.* Dr. Belden instructed Mr. Weeman to "get wrist splints and wear them as needed." *Id.*

On August 30, 2017, Mr. Weeman saw nurse practitioner Mikayla Chase, who works with Dr. Johnson. *Id.* at 1115, 1118. Ms. Chase filled out a "Physical Ability Assessment" form in which she stated that due to Mr. Weeman's "[m]ultiple severe chronic medical issues to include CHF combined systolic + diastolic CKD end stage, carpal tunnel, OA [osteoarthritic] hands/hips, DDD [degenerative disc disease] lumbar," she did not "feel he is capable to fulfill desired/expected work requirements." *Id.* at 1116-17. Ms. Chase is "not a functional assessment specialist." *Id.* at 1119. On August 31, 2017, Dr. Wasserman also filled out a physical ability assessment form, stating that Mr. Weeman's "[a]dvanced CKD and severe dilated cardiomyopathy" made him "unable to return to work" because he "could not have physical stamina to participate in meaningful work." *Id.* at 1122-23.[13]

---

[13]    LINA indicates that "Dr. Wasserman did not provide any bases for this opinion," in part because he did not "explain which conditions supported such limitations . . .." *Def.'s App. of Facts* ¶ 54. Given Dr. Wasserman's reference to "[a]dvanced CKD and severe dilated cardiomyopathy," *Administrative R.* at 1123, the Court does not believe LINA's characterization of Dr. Wasserman's assessment—that he "simply accepted what [Mr. Weeman] told him, at face value," *Def.'s App. of Facts* ¶ 54—to be accurate, particularly given the fact that Dr. Wasserman had served as Mr. Weeman's nephrologist since October 29, 2014, and had had almost three years to directly observe Mr. Weeman. *Administrative R.* at 854.

On October 16, 2017, Dr. Howard Schwartz,[14] a doctor board certified in internal medicine and cardiovascular disease, conducted a "Specialist Review – Cardiology" at LINA's request. *Id.* at 875-79. Dr. Schwartz wrote that Mr. Weeman had nonischemic cardiomyopathy, chronic systolic heart failure, a history of ventricular tachycardia, an ICD implantation, and chronic kidney disease with a history of renal cell carcinoma. *Id.* at 875. Dr. Schwartz expressed disagreement with Dr. Rosenblatt, stating that "[t]he treating provider's opinion is not well supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the claim file . . .." *Id.* at 875-76. Dr. Schwartz wrote that Mr. Weeman could sit "[f]requently, with position changes as required," could stand and walk occasionally, and faced no restrictions on his fine manipulation and simple and firm grasping. *Id.* at 878.

On November 9, 2017, Dr. Kevin Smith[15]—board certified in occupational medicine—also completed a specialist review, stating that despite Mr. Weeman's carpal tunnel, degenerative joint disease, osteoarthritis of the hands and hips, lumbar degenerative disc disease, and hyperlipidemia, "an inability to work in any capacity is not supported by the clinical findings." *Id.* at 870, 872-74. Dr. Smith concluded

---

[14] There is no clear indication of who Dr. Schwartz is. In his motion, Mr. Weeman says that Dr. Schwartz is LINA's cardiologist. *Pl.'s Mot.* at 6. According to the Administrative Record, Dr. Schwartz performed a "specialist review – cardiology" on October 16, 2017. *Administrative R.* at 875-79. Dr. Schwartz identifies himself as "Medical Director" but does not identify his affiliation. *Id.* at 879. For purposes of this review, the Court assumes that Dr. Schwartz was one of LINA's medical directors.

[15] There is no clear indication of who Dr. Smith is. In his motion, Mr. Weeman says that Dr. Smith is LINA's occupational medicine specialist. *Pl.'s Mot.* at 8. According to the Administrative Record, Dr. Smith performed a "specialist review" on October 16, 2017. *Administrative R.* at 870-74. Dr. Smith identifies himself as "Board Certified in Occupational Medicine" but does not identify his affiliation. *Id.* at 874. For purposes of this review, the Court assumes that Dr. Smith was one of LINA's occupational medicine specialists.

that Mr. Weeman could stand and walk fifteen minutes at a time, each for a total of two hours over an eight-hour work day, and could sit for thirty to sixty minutes at a time for up to six to eight hours per day. *Id.* at 873. Dr. Smith also believed Mr. Weeman could frequently fine manipulate and grasp. *Id.* Dr. Smith further stated that "[f]or the initial return to activities, a 4 hours/day shifts should be considered for one month." *Id.*

On November 17, 2017, Kristina DeSantis,[16] a rehabilitation specialist, completed a TSA of Mr. Weeman based in part on the medical reviews by Drs. Smith and Schwartz. *Id.* at 867-68. Ms. DeSantis' conclusion was the same as that of the earlier TSA completed by Ms. Bakos: that Mr. Weeman could work as a relay record clerk. *Id.* at 868.

On November 21, 2017, Jomi H., an appeals specialist for LINA, sent Mr. Weeman a letter informing him that LINA had approved benefits for an extra month—through September 28, 2017—due to the time he spent recovering from his cardiac catheterization in August. *Id.* at 433-35, 437. The letter also stated, however, that Mr. Weeman had not met his burden to prove disability beyond September 28, 2017, as "the clinical findings d[id] not demonstrate evidence of a functional impairment that would prevent [Mr. Weeman] from performing the identified

---

[16] There is no clear indication of who Ms. DeSantis is. The parties do not clarify her relationship with LINA. According to the Administrative Record, on November 17, 2017, Jomi Harris referred Mr. Weeman's file to Ms. DeSantis to perform a transferrable skills analysis. *Administrative R.* at 867. The November 21, 2017 denial letter says that LINA's "Vocational Rehabilitation department conducted a Transferable Skill Analysis taking into consideration your wage requirement, functional capacity, education, training and experience." *Administrative R.* at 435. Here, the Court infers that Jomi H., the author of the LINA denial letter, was referring to Ms. DeSantis' transferable skills analysis and that Ms. DeSantis worked for LINA.

sedentary demand occupation" of record relay clerk.  *Id.* at 435.  Furthermore, while LINA gave "significant weight" to the Social Security Administration's (SSA) 2015 determination that Mr. Weeman was disabled, the SSA had not conducted any new testing or evaluation of Mr. Weeman since its initial determination.  *Id.* at 436.

### 7.  Mitchell A. Weeman's Second Appeal

On March 28, 2018, counsel for Mr. Weeman submitted a second appeal, stating that LINA's denial of Mr. Weeman's claim was "unsupported by the relevant facts . . .."  *Id.* at 639.  The appeal further states that "Mr. Weeman suffers from the severe and disabling illnesses of advanced Stage III-IV systolic congestive heart failure status-post MI, with implanted defibrillator, dilated cardiomyopathy, Stage 3 chronic kidney disease, osteoarthritis of the hands, right carpal tunnel syndrome, morbid obesity, and bilateral hip replacement."  *Id.* at 640.  The appeal went on to detail much of his medical history,  and included five documents of note: (1) a March 7, 2018 questionnaire filled out by Dr. Johnson; (2) a March 21, 2018 questionnaire filled out by Dr. Wasserman; (3) a March 22, 2018 letter from Dr. Rosenblatt; (4) a March 22, 2018 vocational report by vocational rehabilitation counselor Susan Gaudet;[17] and (5) an affidavit from Mr. Weeman.  *Id.* at 638.

Dr. Johnson stated in his questionnaire that he believed Mr. Weeman's "heart failure is his most limiting and concerning medical problem," and that "he worked as long as he could and beyond the point when most individuals would have retired."  *Id.*

---

[17]    The Administrative Record reveals that Ms. Gaudet, a vocational rehabilitation counselor, was asked to review Mr. Weeman's file by Attorney Andrew Bernstein, Mr. Weeman's lawyer. *Administrative R.* at 690-98.  There is no suggestion Ms. Gaudet was affiliated with LINA.

at 669-70. Dr. Wasserman, in his questionnaire, reiterated his conclusion that Mr. Weeman could not return to work, stating that he has "decreased stamina in the setting of cardiac ejection Fx of 20% + stage 3 CKD." *Id.* at 661-62. In Dr. Rosenblatt's letter, he stated that after "caring for Mitchell Weeman for almost fifteen years," Mr. Weeman "is severely impaired and [Dr. Roseblatt feels] his prognosis is poor as it pertains to being able to perform successfully in a working environment" due to his "severely dilated cardiomyopathy," "implantable cardioverter-defibrillator," and his "history of ventricular tachycardia." *Id.* at 667.

In her vocational report, Ms. Gaudet wrote her conclusion that "[t]he objective medical evidence written by Drs. Johnson, Rosenblatt and Wasserman, support that Mr. Weeman does not possess the physical stamina required for full-time competitive employment," as he "does not possess the stamina or physical abilities to maintain any full-time job," due to his "multiple significant and chronic conditions with associated side effects and sequelae that preclude full-time work." *Id.* at 698. In his affidavit, Mr. Weeman restated his medical conditions, further explaining that "[w]henever [he] attempt[s] to take a walk, [he] ha[s] to stop frequently because [he] quickly become[s] short of breath," that he "cannot sit for up to 6 hours over the course of an 8-hour day because both of [his] legs go numb," and that due to the osteoarthritis in his hands, his grip strength has become considerably reduced and he is unable to write or use a computer for any meaningful period without his hands becoming tired. *Id.* at 701-03.

On April 18, 2018, Drs. James Wood,[18] board certified in internal medicine, and Robert Weber,[19] board certified in cardiology, completed specialist reviews. *Id.* at 1472, 1475, 1477, 1479. Dr. Wood focused his review on Mr. Weeman's chronic kidney disease, stating that Mr. Weeman was "not functionally limited from a nephrology standpoint" and "no activity restrictions [we]re medically necessary." *Id.* at 1478. Dr. Wood did not consider Mr. Weeman's heart conditions, osteoarthritis, carpal tunnel, or lumbar degenerative disk disease. *Id.* at 1478-79. Dr. Weber limited his review to Mr. Weeman's cardiomyopathy, congestive heart failure, and ICD implantation, which he said required "moderate restrictions . . .." *Id.* at 1472.[20] Dr. Weber stated that, based on Mr. Weeman's heart conditions, he could stand for "up to 30 minutes at a time for a total of 2 hours per day," walk "up to 30 minutes at a time for a total of 2 hours per day," and sit "up to 1 hour at a time for a total of 4 hours per day." *Id.* at 1474. Additionally, Dr. Weber wrote that Mr. Weeman could reach frequently and fine manipulate and grasp constantly. *Id.*

---

[18]    There is no clear indication of who Dr. Wood is. In its motion, LINA merely identifies Dr. Wood as an "[i]nternal medicine specialist." *Def.'s Mot.* at 10. According to the Administrative Record, Dr. Wood performed a "specialist review" on April 18, 2018. *Administrative R.* at 1477-79. Dr. Wood identifies himself as "Internal Medicine, Licensed Physician" but does not identify his affiliation. *Id.* at 874. For purposes of this review, the Court assumes that Dr. Wood was one of LINA's internal medicine specialists.

[19]    There is no clear indication of who Dr. Weber is. In its motion, LINA merely identifies Dr. Weber as a "Board certified cardiologist." *Def.'s Mot.* at 10. According to the Administrative Record, Dr. Weber performed a "specialist review" on April 18, 2018. *Administrative R.* at 1472-75. Dr. Weber identifies himself as "Cardiology, Licensed Physician" but does not identify his affiliation. *Id.* at 874. For purposes of this review, the Court assumes that Dr. Weber was one of LINA's cardiologists.

[20]    Dr. Weber also wrote that "[a]ltogether, the claimant's extensive cardiac history along with chronic kidney disease as well as other co-morbidities, warrant significant restrictions . . .." *Id.* at 1474. As noted above, however, Dr. Weber also stated that he did not consider Mr. Weeman's kidney conditions, which were "out of [his] area of expertise . . .." *Id.* at 1475.

On May 4, 2018, Dr. Mahdy Flores,[21] board certified in occupational medicine, completed a specialist review assessing "[a]ll of [Mr. Weeman's] conditions . . .." *Id.* at 1465, 1470. With regard to Mr. Weeman's carpal tunnel syndrome, Dr. Flores wrote that "[t]here is no sufficient objective evidence to support functional limitations. Many physical exams find no motor or sensory deficits throughout." *Id.* at 1466. Dr. Flores had the same conclusion as Dr. Wood that Mr. Weeman's chronic kidney disease did not require functional restrictions. *Id.* With regard to Mr. Weeman's heart conditions, Dr. Flores stated that "while Mr. Weeman is moderately functionally limited secondary to his heart failure with low EF [ejection fracture], the total activity restrictions are not supported." *Id.* Dr. Flores wrote that Mr. Weeman was capable of sitting, fine manipulation, and grasping constantly, could stand for "30 min at a time, for max 2 hrs 40 min. per 8-hours work day," and could walk for the same period of time. *Id.* at 1468-69. Dr. Flores also noted that in conversation with Dr. Johnson, Dr. Johnson noted "diffuse arthritis that the claimant has been able to manage," which he felt "preclude[d] manual-type labor." *Id.* at 1469. Dr. Johnson also stated that, "[w]hile he feels [Mr. Weeman] may be physically capable of performing in a sedentary occupation, he does not believe [Mr. Weeman] has the training required to do so," and that "the amount of time and effort required for this

---

[21] There is no clear indication of who Dr. Flores is. In its motion, LINA merely identifies Dr. Weber as an "board certified occupational medicine specialist." *Def.'s Mot.* at 10. According to the Administrative Record, Dr. Flores performed a "specialist review" on May 4, 2018. *Administrative R.* at 1465-70. Dr. Flores identifies herself as "Family Practice, Occupational Medicine, Licensed Physician" but does not identify her affiliation. *Id.* at 1470. For purposes of this review, the Court assumes that Dr. Flores was one of LINA's occupational medicine specialists.

type of vocational training may be too extreme for [Mr. Weeman's] age." *Id.* at 1469-70.

On May 9, 2018, rehabilitation specialist Cindy Herzog[22] completed a TSA based in part on the specialist reviews of Drs. Flores, Weber, and Wood, and agreed with the conclusions of the previous two TSAs by Ms. Bakos and Ms. DeSantis. *Id.* at 1460-62.

On May 10, 2018, John A., an appeals specialist for LINA, informed counsel for Mr. Weeman that LINA was "affirming [its] previous decision of May 11, 2017 within the meaning and terms of his group Long Term Disability policy. *Id.* at 422, 424-25. John A. further noted that Mr. Weeman's "complaints of pain were not well-supported by the available objective evidence." *Id.* at 423.

## II. POSITIONS OF THE PARTIES

### A. Mitchell A. Weeman's Motion for Judgment on the Administrative Record

Mr. Weeman states that the "arbitrary and capricious standard of review applies to [LINA's] Decision on [Mr. Weeman's] claim." *Pl.'s Mot.* at 6. Mr. Weeman makes six arguments in his motion: (1) LINA's reliance on the opinion of Dr. Schwartz

---

[22]     There is no clear indication who Ms. Herzog is. In its motion, LINA says that "LINA had a third TSA by Rehabilitation Specialist Cindy Herzog, MS, CRC on May 9, 2018." *Def.'s Mot.* at 11. She identifies herself as a "Rehabilitation Specialist" but does not describe her affiliation. *Administrative R.* at 1462. But the parties do not clarify her relationship with LINA.

     According to the Administrative Record, on May 9, 2018, John Archacki referred Mr. Weeman's file to Ms. Herzog to perform a transferrable skills analysis. *Administrative R.* at 1460. The May 10, 2018 denial letter says that LINA "referred his file for a Transferable Skills Analysis (TSA) by a certified vocational rehabilitation counselor to determine if occupations exist that he could perform based on the above restrictions and for which he would be reasonably qualified based on education, training and experience." *Administrative R.* at 423.

     Here, although it is not entirely clear, the Court infers that John A., the author of the May 10, 2018 LINA denial letter, was referring to Ms. Herzog' transferable skills analysis and that Ms. Herzog worked for LINA.

was arbitrary and capricious; (2) LINA's reliance on the opinion of Dr. Smith was unsupported; (3) Dr. Weber's report, which LINA relied on, was incomplete and contained significant omissions; (4) LINA's reliance on Dr. Wood's opinion was not supported by substantial evidence; (5) the evidence in the record shows that Mr. Weeman is disabled within the meaning of the Group Policy; and (6) Mr. Weeman cannot perform any position for which he is reasonably qualified by education, training, or experience. *Id.* at 6-16.

First, Mr. Weeman argues that reliance by LINA on Dr. Schwartz's opinion was unsupported. *Id.* at 6. Mr. Weeman reiterates the symptoms related to his congestive heart failure and cardiomyopathy, as well as Dr. Rosenblatt's assessment of these conditions. *Id.* at 7. Mr. Weeman points out that, in his report, Dr. Schwartz neglected to "address or mention any limitations or restrictions resulting from [Mr. Weeman's] loss of stamina and energy, shortness of breath, fatigue or weakness." *Id.* at 8. Mr. Weeman regards this failure as a "glaring omission in Dr. Schwartz's analysis." *Id.*

Second, Mr. Weeman states that Dr. Smith's opinion that Mr. Weeman should only do four hour shifts per day for his first month at work is "purely speculative," as "[n]either Dr. Smith nor [LINA] offer any explanation for why they believe that Mr. Weeman should return to work part-time for the first month, at 4 hours per day, but can work full-time after that one-month period." *Id.*

Third, Mr. Weeman argues that Dr. Weber's report "is incomplete and contains glaring omissions." *Id.* at 9. Mr. Weeman notes that Dr. Weber states Mr. Weeman

is only capable of sitting for four hours per day, and that this opinion "does not allow [Mr. Weeman] to perform any sedentary occupation because a limitation to 4 hours of sitting does not qualify as an ability to 'sit most of the time' in a normal workday," as is required for a sedentary position based on the Department of Labor's Dictionary of Occupational Titles. *Id.* Thus, in Mr. Weeman's view, Dr. Weber actually agrees with him that he is incapable of sedentary work. *Id.* at 9-10. Mr. Weeman further asserts that it was unreasonable for Dr. Weber to ignore Mr. Weeman's limitations based on his low ejection fracture and shortness of breath, as well as to fail to address Mr. Weman's chronic kidney disease in concert with his cardiac conditions. *Id.* at 10.

Fourth, Mr. Weeman states Dr. Wood's review should be given considerably less weight than Dr. Wasserman's opinion because "Dr. Wood is not a nephrologist, but simply a licensed internal medicine physician." *Id.* at 10-11. Additionally, Mr. Weeman states that Dr. Wood should have considered the impact of Mr. Weeman's heart and kidney diseases together. *Id.* at 11.

Fifth, Mr. Weeman argues Mr. Weeman meets the definition of "disabled" in the Group Policy. *Id.* In support, Mr. Weeman reiterates the positions of his treating physicians that he is unable to work, and states that LINA "relied solely upon the opinions of its physicians, Dr. Weber and Dr. Wood, for its final denial of [Mr. Weeman's] claim on appeal. These reviewing physicians failed to recognize, consider or appreciate that [Mr. Weeman's] severe cardiac illness and kidney disease would severely limit his activity" due to his various symptoms. *Id.* at 11-14.

Sixth, Mr. Weeman quotes much of Ms. Gaudet's report as support for the proposition that he "cannot perform other gainful occupations for which he is reasonably qualified by education, training, or experience." *Id.* at 15.

## B.     LINA's Motion for Judgment on the Administrative Record

LINA argues that it "reviewed [Mr. Weeman's] claim fully and fairly," including "two independent appellate reviews conducted by different personnel," "medical advice from no less than six board certified physicians," and "transferable skills analyses that identified sedentary occupations [Mr. Weeman] could perform" from "three different vocational rehabilitation counselors . . .." *Def.'s Mot.* at 2.  In LINA's estimation, Mr. Weeman "failed to meet his burden" to prove "that he was totally disabled from any occupation . . . including sedentary positions," and instead presented only "his own subjective belief that he could not do any work in any capacity, as accepted at face value by some of his treating physicians." *Id.* at 1-2 (emphasis omitted).  LINA argues that its determination "would withstand any standard of review." *Id.* at 4.  In support, LINA makes three arguments: (1) LINA provided Mr. Weeman with a full and fair review that correctly concluded he had failed to meet his burden; (2) LINA's determination was supported by the medical evidence; and (3) LINA's determination was supported by the vocational evidence. *Id.* at 4-23.

### 1.     Mitchell A.  Weeman Failed to Meet His Burden to Show Disability

LINA asserts that it is Mr. Weeman who bears the burden of proving disability, not LINA's burden to disprove his claim. *Id.* at 4 (citing First Circuit caselaw).

Additionally, LINA states that it "had a duty to the plan to follow the plan terms, to only pay benefits to claimants who proved entitlement thereto, and to not pay benefits to those claimants who fail to prove disability." *Id.* at 5 (citing *Conkright v. Frommert*, 559 U.S. 506 (2010)). LINA then outlines its view of the factual background of Mr. Weeman's claim, *id.* at 7-11, ultimately concluding that it "fully and fairly reviewed all the evidence and reached not only a reasonable conclusion, but the only conclusion possible under the circumstances." *Id.* at 11.

### 2. LINA's Determination Is Supported by the Medical Evidence

LINA argues that it "had no obligation to defer to the conclusory opinions of the physicians who signed forms and wrote advocacy letters, over the opinions of the six physicians who reviewed the entirety of the record and found evidence of impairment from sedentary work entirely lacking." *Id.* at 11 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). It argues that Mr. Weeman's treating physicians' opinions boil down to a face value acceptance of Mr. Weeman's subjective self-assessment, and that courts have held that disability insurers like LINA need not give special weight to the opinions of the treating physicians because "expressing skepticism about subjective complaints might impair the therapeutic relationship" between these physicians and Mr. Weeman. *Id.* at 12-14.

Furthermore, LINA contends that Mr. Weeman's treating physicians' "post-hoc . . . certifications/advocacy statements . . . were inconsistent with, if not directly contrary to, the contemporaneous medical records which constituted the best evidence of [Mr. Weeman's] physical condition at any point in time." *Id.* at 14. As

such, LINA states that it and "the six independent reviewing physicians correctly emphasized the lack of objective evidence of impairment, a mode of analysis that is thoroughly accepted in the case law." *Id.* at 17.

### 3. LINA's Determination Is Supported by the Vocational Evidence

LINA further argues that the conclusions of Ms. Bakos, Ms. DeSantis, and Ms. Herzog in the TSAs each completed that Mr. Weeman was capable of working as a record relay clerk were correct. *Id.* at 19-20. LINA points out that "[v]ocational reviewers are not physicians and thus cannot . . . opine on medical issues such as appropriate medical restrictions and limitations." *Id.* at 20. Rather, "they must compare the transferable skills they identify to assumed medical restrictions and limitations in order to determine a claimant's capacity to perform any given occupation." *Id.* at 21. LINA advances the position that while the vocational experts properly relied on the list of restrictions they were given by the reviewing physicians in formulating their TSAs, Ms. Gaudet "simply purported to reach her own medical conclusions about [Mr. Weeman's] functional capacity." *Id.* at 21-22. As such, LINA believes that Ms. Gaudet's report deserved no weight. *Id.* at 22.

### C. Mitchell A. Weeman's Objections to LINA's Motion for Judgment on the Administrative Record

In opposition to LINA's Motion for Judgment on the Administrative Record, Mr. Weeman objects to LINA's characterization that Mr. Weeman "provided 'zero proof' of [his] disability." *Pl.'s Objs.* at 1. Mr. Weeman repeated the statements of his treating physicians, *id.* at 1-3, and goes on to restate his points that (1) LINA "failed to have any qualified medical expert consider the combined impact of [Mr. Weeman's]

severe illnesses on his functional capacity," *id.* at 3; and (2) that Dr. Weber's report, in stating that Mr. Weeman could only sit for four hours per day, was inconsistent with his conclusion that Mr. Weeman was capable of sedentary work. *Id.* at 3-4.

### D. LINA's Opposition to Mitchell A. Weeman's Motion for Judgment on the Administrative Record

LINA states that Mr. Weeman's motion "is a lengthy recitation of his medical conditions and symptoms with minimal analysis as to how those conditions and symptoms resulted in physical impairment from any occupation—even sedentary positions." *Def.'s Opp'n* at 1 (emphasis omitted). The problem with this, in LINA's estimation, is that "a diagnosis alone is not proof of disability, rather it is the effect of the disease on the claimant's ability to work that is determinative." *Id.* LINA then summarizes its arguments for why its determination that Mr. Weeman failed to meet his burden to demonstrate disability was correct, pointing to what LINA believes to be the subjective nature of the affidavits and reports from Mr. Weeman and his treating physicians, as well as what LINA terms "contradict[ory]" statements made by Mr. Weeman to those same physicians.[23] *Id.* at 2-8. LINA further argues that Mr. Weeman's criticism of the reviews done by Drs. Schwartz, Smith, Weber, and Wood were incorrect, as those doctors based their reviews on "the entirety of [Mr. Weeman's] medical file . . .." *Id.* at 8-9.

---

[23] With regard to Drs. Rosenblatt and Wasserman, LINA particularly notes that they did not "purport to have conducted any functional testing or analysis, or to have reviewed the comprehensive medical records in an effort to test [Mr. Weeman's] subjective self-assessments against the actual evidence." *Id.* at 5.

In discussing the reviews by these doctors, LINA addresses Mr. Weeman's arguments. *Id.* at 9-12. LINA states that Dr. Schwartz did consider Mr. Weeman's symptoms such as shortness of breath, but "there was no objective assessment of [Mr. Weeman's] exercise capacity . . .." *Id.* at 10. Dr. Smith's report, in LINA's view, was not speculative, because the suggestion that Mr. Weeman transition into full-time work was reasonable. *Id.* at 10-11. LINA also believes Dr. Weber's report is not inconsistent and does not "provide for sub-sedentary capacity" because it demonstrates Dr. Weber's conclusion that Mr. Weeman "could work fulltime but should remain more active throughout the day . . . by standing or walking just as much as he sits" and because Ms. Herzog, in her TSA, found the restrictions set by Dr. Weber to be consistent with sedentary work capacity. *Id.* at 11. LINA argues Dr. Wood's review does deserve weight despite the fact that he "is not a cardiologist, nor an orthopedist" because his review was "properly limited . . . to the conditions within his expertise," and LINA had a variety of specialists who reviewed all of Mr. Weeman's conditions. *Id.* at 11-12. Lastly, LINA points out that Mr. Weeman "does not object to or criticize" the reports of Drs. Flores and Jones, despite the fact that their conclusions were "in line with the four other reviewing physicians." *Id.* at 13.

Additionally, LINA argues again that Ms. Gaudet's vocational analysis should be disregarded because despite her qualifications, she "could not actually perform her duties in rendering a vocational opinion because none of [Mr. Weeman's] treating physicians" provided her with a list of restrictions and limitations which she could "apply to the physical requirements of various occupations . . .." *Id.* Because her

analysis, in LINA's view, is based on "a bald medical conclusion" outside her proper role, it should receive no weight. *Id.* at 14.

## III.  LEGAL STANDARD

"In the ERISA context, summary judgment is merely a vehicle for deciding the case . . .." *Bard v. Bos. Shipping Ass'n,* 471 F.3d 229, 235 (1st Cir. 2006) (citation omitted).  Courts evaluate the denial of ERISA benefits only on the administrative record, giving no inferences in favor of either party. *See id.*  Where "the provisions of the benefit plan at issue 'reflect a clear grant of discretionary authority to determine eligibility for benefits,'" decisions of the insurer receive review under the deferential arbitrary and capricious standard. *Gross v. Sun Life Assurance Co. of Canada*, 734 F.3d 1, 13 (1st Cir. 2013) (emphasis omitted) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 15 (1st Cir. 2002).  Where the plain language of the plan "does not state with sufficient clarity 'that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary,'" the Court applies de novo review to decisions made under ERISA.  *Id.* at 16 (quoting *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000)).

A claim analyzed under arbitrary and capricious review "asks whether a plan administrator's determination 'is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'" *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013) (quoting *Leahy*, 315 F.3d at 17).  "Substantial evidence . . . means evidence reasonably sufficient to support a

conclusion," and "[s]ufficiency . . . does not disappear merely by reason of contradictory evidence." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998). The plan administrator's decision "must be upheld if there is any reasonable basis for it." *Madera v. Marsh USA, Inc.*, 426 F.3d 56, 64 (1st Cir. 2005). Where, as here, the plan administrator "both evaluates claims for benefits and pays benefits claims," courts weigh this structural conflict "as a 'factor in determining whether there is an abuse of discretion.'" *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 115 (2008) (internal citation omitted). It is the plaintiff who "bears the burden of showing that the conflict influenced the Plan administrator's decision in some way." *Troiano v. Aetna Life Ins. Co.*, 844 F.3d 35, 45 (1st Cir. 2016).

"The correct standard" for a claim analyzed under de novo review, is "whether, upon a full review of the administrative record, the decision of the administrator was correct." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 518 (1st Cir. 2005) (internal citation omitted). This analysis "generally consists of the court's independent weighing of the facts and opinions in that record to determine whether the claimant has met his burden of showing he is disabled within the meaning of the policy," with "no deference to administrators' opinions or conclusions based on these facts." *Id.* Thus, even if the evidence in the record is conflicting, summary judgment may properly issue for a party. *See id.* at 518 and n.10. Under either de novo or arbitrary and capricious review, "it is the plaintiff who bears the burden of proving he is disabled." *Id.* at 519.

As Mr. Weeman has stated that arbitrary and capricious review applies, *Pl.'s*

*Mot.* at 6; *Pl.'s Objs.* at 4, that is the standard the Court will use.[24]

## IV. DISCUSSION

### A. Structural Conflict

Mr. Weeman does not raise LINA's structural conflict or assert that it influenced LINA's decision-making. As it is Mr. Weeman's burden to raise LINA's conflict—that it is both the entity which "evaluates claims for benefits and pays benefits claims," *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)—Mr. Weeman has not met this burden. However, the First Circuit's admonition that courts are "duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts," *Cusson v. Liberty Life Assurance Co. of Bos.*, 592 F.3d 215, 224 (1st Cir. 2010) (abrogated on other grounds by *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016)) (quoting *Denmark v. Liberty Life Assurance Co. of Bos.*, 566 F.3d 1, 9 (1st Cir. 2009)), impels the Court to consider the issue sua sponte.

Here, there is evidence on the record that LINA took some pains to maintain the independence of its review. For each round of appeal, a new claims reviewer was

---

[24] Mr. Weeman concedes that the "arbitrary and capricious" standard applies. *Pl.'s Mot.* at 6 ("The arbitrary and capricious standard of review applies to Defendant's Decision on the Plaintiff's claim"); *Pl.'s Obj.* at 4 ("For these reasons, the Defendant's decision to deny the Plaintiff's Long Term disability claim was arbitrary and capricious and should be reversed"). Neither party argued that the Court should apply the default rule, which requires review under a de novo standard. *See Gross*, 734 F.3d at 11; *Hatfield v. Blue Cross and Blue Shield of Mass., Inc.*, 162 F. Supp. 3d 24, 34 (D. Mass. 2016). In view of the parties' agreement, the Court has not independently reviewed the language of the Group Policy in this case to determine whether it grants LINA "discretionary authority to determine eligibility for benefits or to construe the terms of the plan at issue." *Hatfield*, 162 F. Supp. 3d at 35 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

used (David R., Jomi H., and John A.), *Administrative R.* at 422, 433, 467, and there is no suggestion LINA made any sort of predetermination or told the reviewers what they should conclude. In addition, LINA sought six reviews from physicians, many with different specialties, and three from vocational experts. This suggests that LINA engaged in a thorough process.

However, the Court is skeptical that such structural conflicts can ever be fully insulated from influencing the result of a claims investigation. In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), addressing a similar issue in the social security context, the Supreme Court observed that it did not "question the Court of Appeals' concern that physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements.'" *Id.* at 832 (quoting *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir. 2001), *abrogated on other grounds by Black & Decker*, 538 U.S. 822))).

Although not ultimately outcome-determinative, the structural conflict is a factor in the Court's evaluation of the reviews and reports marshalled by LINA in support of its determination. Yet the case for a structural conflict that affected LINA's denial of benefits in this case is unconvincing on this record. Mr. Weeman did not argue the issue and, as the Court repeatedly noted in its footnotes, the exact relationship of the reviewing physicians and the vocational experts is not clear. Without more, the Court merely accepts the possibility of a structural conflict in its assessment of the pending motions.

**B.      Reasonableness and Substantial Evidence**

The record demonstrates that LINA had substantial evidence and a reasonable basis to deny Mr. Weeman's claim.  It has been Mr. Weeman's burden to show that he was "unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience." *Administrative R.* at 1394.  He has not done so, and his arguments about LINA's reliance on non-treating physicians are unavailing under the arbitrary and capricious standard.

**1.      The Opinions of Mitchell A. Weeman's Treating Physicians**

The primary affirmative pieces of evidence presented by Mr. Weeman in support of his disability claim are the opinions of Mr. Weeman's treating physicians, Drs. Johnson, Rosenblatt, and Wasserman.  Mr. Weeman argues that it was a "glaring omission . . . demonstrat[ing] the lack of substantial evidentiary support for its denial" that LINA "relied solely upon the opinions of its physicians," as opposed to Mr. Weeman's treating physicians.  *Pl.'s Mot.* at 14-15.  The Court addresses the opinion of each treating physician in turn, as well as Mr. Weeman's affidavit.

**a.      Dr. Johnson**

While Dr. Johnson did state at least twice that Mr. Weeman could not work, *Administrative R.* at 669-70, 679, it is not clear from the record that this is an accurate reflection of his belief.  In his conversation with Dr. Flores, Dr. Johnson stated that Mr. Weeman might be "physically capable of performing in a sedentary occupation," but that "he does not believe [Mr. Weeman] has the training required to

38

do so." *Id.* at 1469-70. Dr. Johnson is Mr. Weeman's primary care physician and there is no indication that his assessment of Mr. Weeman's training is within his expertise. What remains is Dr. Johnson's oral statement directly contradicting his previous assessments that Mr. Weeman could not work. Given the contradiction, the Court does not view Dr. Johnson's opinions as sustaining Mr. Weeman's burden to demonstrate LINA's denial was arbitrary and capricious.

### b.    Dr. Rosenblatt

Dr. Rosenblatt has opined on three occasions that Mr. Weeman cannot work. On the first, November 4, 2016, he wrote that Mr. Weeman "[c]annot work around Electrical current," and went on to write that Mr. Weeman "[c]annot work" and would likely never be able to return to work. *Id.* at 1163. It is unclear whether this statement refers only to jobs that would require proximity to electrical currents or any occupation whatsoever. If the latter, his stated explanation gives little basis for his position, as he does not give any reason why Mr. Weeman could not do a job that did not require him to be around electrical currents. If the former, this opinion is not relevant to this case, as it is Mr. Weeman's burden to show that he is disabled from any occupation. *Administrative R.* at 1394 ("unable to perform the material duties of any occupation").

On the second occasion, May 16, 2017, Dr. Rosenblatt wrote that Mr. Weeman was "[u]nable to work" and could not return to work "in the near future," *id.* at 1155, but he did not provide any further explanation. This conclusion is somewhat belied by his statement on May 10, 2017, that Mr. Weeman was "doing relatively well," and

"does find he is short of breath when he exerts himself, but admits he has not really been doing much exercise outside." *Id.* at 899. It is not clear how Dr. Rosenblatt determined that someone who has shortness of breath when exercising but not at rest, *id.* at 899, 906, would be unsuited for sedentary work. He did not explain further.

On the third occasion, contained in Dr. Rosenblatt's March 22, 2018, letter, Dr. Rosenblatt stated that after "caring for Mitchell Weeman for almost fifteen years," Mr. Weeman "is severely impaired and [Dr. Rosenblatt feels] his prognosis is poor as it pertains to being able to perform successfully in a working environment" due to his "severely dilated cardiomyopathy," "implantable cardioverter-defibrillator," and his "history of ventricular tachycardia." *Id.* at 667. To the extent Dr. Rosenblatt was stating his belief that Mr. Weeman is incapable of sedentary work, he did not point to any of Mr. Weeman's symptoms or findings that led him to this conclusion. Nor does he point to any functional exercise testing he conducted. In fact, when asked about this by Dr. Schwartz, "[h]e was not able to find any records regarding the performance of an exercise test," but rather offered "his guess . . . that [Mr. Weeman] could probably achieve 5 METs, which is completing stage I of a standard Bruce protocol." *Id.* at 877. Furthermore, his statement regarding the length of time he had been treating Mr. Weeman calls to mind the Supreme Court's supposition in *Black & Decker* that "a treating physician, in a close case, may favor a finding of 'disabled.'" 538 U.S. at 832. In applying *Black & Decker*, the First Circuit has observed that "it is not 'for a court to determine precisely how much weight [an

insurer] should have accorded [a particular piece of evidence] in its overall decision."

*Tsoulas v. Liberty Life Assurance Co. of Bos.*, 454 F.3d 69, 77 (1st Cir. 2006)

(alterations in original) (quoting *Gannon v. Metro. Life. Ins. Co.*, 360 F.3d 211, 214

(1st Cir. 2004)).  The Court will not do so here.

### c.      Dr. Wasserman

As the Court has previously stated, LINA is incorrect to assert that Dr.

Wasserman did not "explain which conditions supported" his recommendation of no

work on August 31, 2017,  *Def.'s App. of Facts* ¶ 54; however, it is also true that, as

with Dr. Rosenblatt, Dr. Wasserman did not explain the symptoms or findings that

specifically made it impossible in his view for Mr. Weeman to perform sedentary

work.  The same problem exists with regard to Dr. Wasserman's March 21, 2018,

assessment.   Given this lack of explanation and the First Circuit's language in

*Tsoulas*, the Court will not conclude that it was unreasonable for LINA to weigh Dr.

Wasserman's opinion differently from the weight given it by Mr. Weeman.

### d.      Mitchell A. Weeman's Affidavit

The First Circuit has noted that "even in the context of social security disability

claims, where deference is ordinarily accorded to the opinions of treating physicians,

no deference is given to a physician's opinion that a claimant is disabled or unable to

work because that is not a medical opinion."  *Morales-Alejandro v. Med. Card Sys.,*

*Inc.*, 486 F.3d 693, 700 n.7 (1st Cir. 2007) (citations omitted).   Stripped of the

assertions of disability from his treating physicians, Mr. Weeman's motion does not

provide  much  more  than  a  list  of  his  diagnoses  and  symptoms  and  conclusory

assertions about what they mean for his ability to work. *Pl.'s Mot.* at 3-5. As LINA points out, his conditions themselves are undisputed, *Def.'s Opp'n* at 2, and Mr. Weeman's recitation of his symptoms, such as "shortness of breath, fatigue, and loss of energy and stamina," his "dramatically reduced . . . grip strength," and his inability to "type on a computer for any meaningful period of time" are largely limited to his own affidavit. *Pl.'s Mot.* at 4-5 (citing *Administrative R.* at 702-03). Mr. Weeman's affidavit makes clear to the Court "beyond question that a return to work would add a substantial burden to [Mr. Weeman's] already difficult life." *Brigham v. Sun Life of Can.*, 317 F.3d 72, 84 (1st Cir. 2003). However, as in *Brigham*, the Court "cannot say that the insurer was required to conclude, on the medical evidence provided, that that burden rendered him totally disabled." *Id.*

The First Circuit recognizes that some medical conditions, like fibromyalgia and chronic fatigue syndrome, are not conducive to objective findings. *See Cook v. Liberty Life Assur. Co. of Bos.,* 320 F.3d 11, 21 (1st Cir. 2003) (citing *Vega v. Comm. of Soc. Sec.*, 265 F.3d 1214, 1219 (11th Cir. 2001); *Brigham*, 317 F.3d at 84 ("We fully recognize that laboratory tests or similar diagnostic procedures will not always be necessary to substantiate a claim of disability, as certain disabling conditions are not susceptible to such objective evaluations"); *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994); *Sisco v. HHS*, 10 F.3d 739, 744 (10th Cir. 1993)). However, in this case, Mr. Weeman does not appear to contend that his disabling condition is one that is difficult to objectively corroborate, and the absence of testing of his functional capacity to validate his claim of disability was a reasonable factor for LINA to consider.

### 2.     LINA's Reliance on Analyses of Non-Treating Physicians and Alleged Failure to Consider Mr. Weeman's Conditions in Concert

In his motion, Mr. Weeman makes five arguments related to the doctors that LINA had review his records over the course of his claim. The Court addresses each in turn.

#### a.     Dr. Schwartz

Mr. Weeman argues that Dr. Schwartz's "fail[ure] to address or mention any limitations or restrictions resulting from [Mr. Weeman's] loss of stamina and energy, shortness of breath, fatigue or weakness" is an omission "demonstrat[ing] that Dr. Schwartz's report and opinions are incomplete and unpersuasive." *Pl.'s Mot.* at 8. The Court disagrees that Dr. Schwartz's report did not address these symptoms. First, Dr. Schwartz stated that he "reviewed all available medical and/or vocational evidence, for which [he had] been trained, bearing on Disability and/or functional capacity and . . . considered its impact on the whole person . . .." *Administrative R.* at 875, 879. Second, Dr. Schwartz listed the records he had considered, which included the records of Drs. Johnson, Rosenblatt, and Wasserman, all of whom referred to the symptoms mentioned by Mr. Weeman in his motion—as is made clear by Dr. Schwartz's summary of these records. *Id.* at 875-77. Third, Dr. Schwartz recounted his conversation with Dr. Rosenblatt, which included a discussion of Mr. Weeman's functional ability, and whether Dr. Rosenblatt had obtained any objective measurements of Mr. Weeman's capacity. *Id.* at 877.

### b. Dr. Smith

Mr. Weeman argues that Dr. Smith's failure to explain why "Mr. Weeman should return to work part-time for the first month, at 4 hours per day, but can work full-time after that one-month period" is "purely speculative," and thus reliance on that report by LINA is unsupported. *Pl.'s Mot.* at 8. LINA argues that Dr. Smith was merely "recommend[ing] that rather than jumping back into fulltime work that [Mr. Weeman] make use of a transitional period." *Def.'s Opp'n* at 10-11. The Court agrees with LINA that this is a reasonable interpretation of Dr. Smith's opinion. As Mr. Weeman has not objected to any other aspect of Dr. Smith's report, the Court finds that reliance on it by LINA is supported by the record.

### c. Dr. Weber

Mr. Weeman argues that Dr. Weber's report is inconsistent to the point of arbitrariness. *Pl.'s Mot.* at 9-10. Mr. Weeman points out that "Dr. Weber's opinion that [Mr. Weeman] is limited to no more than 4 hours of sitting per day does not allow [Mr. Weeman] to perform any sedentary occupation because a limitation to 4 hours of sitting does not qualify as an ability to 'sit most of the time' in a normal workday," as required by the Dictionary of Occupational Titles for a sedentary position. *Id.* at 9.

LINA responds that Dr. Weber merely "concluded that [Mr. Weeman] could work fulltime but should remain more active throughout the day . . . by standing or walking just as much as he sits." *Def.'s Opp'n* at 11. Furthermore, in LINA's view, Dr. Weber's listed restrictions could not "provide for sub-sedentary capacity" because

"[v]ocational rehabilitation specialist Cindy Herzog . . . completed a TSA on May 9, 2018 utilizing, among other evidence, Dr. Weber's restrictions and limitations" and "determined that [Mr. Weeman] could work full time as a relay record clerk . . .." *Id.*

In the Court's view, Mr. Weeman's argument cuts much too fine a line. First, it assumes, without authority, that "most" means "majority." The standard definition of "most" is "in the greatest quantity, amount, measure, degree, or number: *to win the most votes*." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE at 1253 (2d ed. 1987). Under Dr. Weber's restrictions, Mr. Weeman could sit more than he could stand, walk or perform other activities.

Second, Dr. Weber wrote that along with other activities, Mr. Weeman should sit "up to 1 hour at a time for a total of 4 hours per day." *Administrative R.* at 1474. Assuming the doctor was referring to an eight-hour workday, Mr. Weeman interprets the four-hour restriction as saying that he could sit a maximum of four hours and not a minute more. Only one minute more would be sitting a majority of an eight-hour day. The Court is not convinced that Dr. Weber intended the four-hour restriction to be so rigorously interpreted.

Finally, the Court agrees with LINA that Ms. Herzog provided the critical link between Dr. Weber's physical restrictions and the impact those physical restrictions had on Mr. Weeman's work capacity. Ms. Herzog conducted an analysis of Mr. Weeman's work capacity based on the reviews provided by Drs. Flores, Weber, and Wood, and found that, when considered together, the physical restrictions laid out by

these doctors were consistent with sedentary work.  *Administrative R.* at 1460.  The Court concurs with LINA that this was a reasonable determination.

### d.    Dr. Wood

Mr. Weeman objects to LINA's giving weight to Dr. Wood's opinion that Mr. Weeman "is not functionally limited from a nephrology standpoint," *Administrative R.* at 1478-79, because "Dr. Wood is not a nephrologist, but simply a licensed internal medicine physician," and therefore "his opinions must be given significantly less weight than the opinions of the physician trained to treat [Mr. Weeman's] kidney disease, his nephrologist Dr. Wasserman." *Pl.'s Mot.* at 10-11.  However, it is not the Court's role to determine the weight an insurer should give a particular piece of evidence.  *Tsoulas*, 454 F.3d at 77.  Additionally, as LINA argues in its opposition, Dr. Wood is only one of six doctors from whom LINA sought review of Mr. Weeman's record.  *Def.'s Opp'n* at 12.  As LINA points out, Dr. Johnson—on whose opinion Mr. Weeman relies—is an internist as well.  *Id.*

Dr. Wood's report evidences a thorough appraisal of the record, including the records of all of Mr. Weeman's treating physicians, *Administrative R.* at 1477, 1479, and it is telling that Mr. Weeman does not object to the extent of Dr. Wood's review.  The Court finds that it was reasonable for LINA to consider and give some amount of weight to Dr. Wood's opinion alongside those of the other physician-reviewers.

### e.    LINA's Failure to Consider Mitchell A.  Weeman's Conditions in Concert

Mr. Weeman says of Drs. Weber and Wood that they did not consider his various conditions in concert, *Pl.'s Mot.* at 10-11, and also that LINA "failed to have

46

any qualified medical expert consider the combined impact of [Mr. Weeman's] severe illnesses on his functional capacity," such that LINA "did not perform a full and fair independent review of [Mr. Weeman's] claim." *Pl.'s Objs.* at 3 (emphasis omitted). The Court cannot agree.

It is clear that at least some of the physician reviewers considered all of Mr. Weeman's conditions and their effect on his capacity to work. Dr. Jones wrote that none of Mr. Weeman's conditions was outside his expertise, and that he had reviewed records from Drs. Rosenblatt and Wasserman.[25] *Administrative R.* at 110-11. Dr. Schwartz also stated that none of Mr. Weeman's conditions was outside of his expertise, *id.* at 878-79, and though his review was focused on Mr. Weeman's cardiac conditions, he noted that Mr. Weeman's "past medical history is also significant for chronic kidney disease" and the record clearly evidences his review of Dr. Wasserman's notes. *Id.* at 876. Additionally, Dr. Flores determined that none of Mr. Weeman's conditions was outside the doctor's areas of expertise. *Id.* at 1469-70. Dr. Flores' report—which, as LINA points out, Mr. Weeman did not object to, *Def.'s Opp'n* at 12-13—evidences a careful review of Mr. Weeman's medical history and a consideration of all of his various conditions. *Administrative R.* at 1466-68. Lastly, all the physicians' reviews contained some slight variation of the following phrase: "All of [Mr. Weeman's] conditions have been assessed to determine which conditions

---

[25] It does not appear that Dr. Jones considered records from Dr. Johnson. However, according to LINA's contemporaneous records, at the time of Dr. Jones' review, "no med [had been] provided to date by Dr. Johnson." *Administrative R.* at 116.

may independently or collectively impact [Mr. Weeman's] functionality (co-limiting)." *Id.* at 110, 875, 1465.

### 3. LINA's Use of Vocational Evidence

Mr. Weeman's final argument is that Mr. Weeman "cannot perform other gainful occupations for which he is reasonably qualified by education, training, or experience," in support of which he raises the investigative report of Ms. Gaudet. *Pl.'s Mot.* at 15-16 (emphasis omitted). In a disclaimer to her report, Ms. Gaudet lays out her qualifications as follows:

> As a Vocational Expert, I have a Master Degree in Rehabilitation Counseling and hold national certification as a Certified Rehabilitation Counselor. I am an approved Vocational Expert for Social Security Administration's Office of Disability Adjudication and Review, providing testimony on individual's ability to work in light of physical and/or mental impairments. I have over 28 years experience providing direct job placement to individuals with physical and/or mental barriers to employments. My opinions are independent of any claims decisions of the referring client. I have no conflicts of interest in the completion of this report.

*Administrative R.* at 698. LINA writes that "Ms. Gaudet did not explain how she is qualified to opine on medical issues such as how much stamina [Mr. Weeman] allegedly has." *Def.'s App. of Facts* ¶ 68. Based on her years of experience placing individuals "with physical and/or mental barriers" into employment, the Court does not agree that Ms. Gaudet demonstrated no basis for her opinion, which was made upon an extensive review of Mr. Weeman's medical history. *Administrative R.* at 690-93, 698. However, it is not the Court's role to evaluate the weight that should be given to particular pieces of evidence. *Tsoulas*, 454 F.3d at 77. LINA sought and received three transferable skills analyses from vocational experts stating that Mr.

Weeman was capable of sedentary work. *Administrative R.* at 1160-61, 867-68, 1460-62. The Court does not find it unreasonable or unsupported that LINA placed more weight on these analyses than on that of Ms. Gaudet.

### C. LINA's Denial of Benefits to Mitchell A. Weeman Was Not Arbitrary and Capricious

It was Mr. Weeman's burden to present sufficient evidence that he could not work full-time in a sedentary position to convince the Court that LINA's denial of his claim was, on the record before it, unreasonable and unsupported. Beyond his subjective affidavit and the opinions of his treating physicians, he has not done so. "An administrator . . . may not . . . cherry-pick the evidence it prefers while ignoring significant evidence to the contrary." *Santana-Díaz v. Metro. Life Ins. Co.*, 919 F.3d 691, 696 (1st Cir. 2019) (quoting *Winkler v. Metro. Life Ins. Co.*, 170 Fed. App'x 167, 168 (2d Cir. 2006)). But LINA has not done so here. It sought six physician reviews of Mr. Weeman's medical file, five of which came to the same clear conclusion: that Mr. Weeman was capable of sedentary work. It does not appear—nor does Mr. Weeman argue—that these reviewers were not provided with all the relevant medical information or restricted in any way from communicating with Mr. Weeman's treating physicians. That LINA did not come to the same conclusion as Mr. Weeman upon a review of the available evidence is not a basis for reversal. *See id.* (stating that the insurer "did in fact consider the evidence that [the plaintiff] alleges that it overlooked, but . . . determined that the evidence did not satisfactorily prove that [the plaintiff] was eligible for LTD benefits under the plan"). While LINA's determination was not the only one available to it on this record, it is clear the conclusion LINA

came to was a reasonable one, made with substantial support.  The Court will not disturb it.

## V.    CONCLUSION

The Court GRANTS Life Insurance Company of North America's Motion for Judgment on the Administrative Record (ECF No. 10) and DENIES Mitchell A. Weeman's Motion for Judgment on the Administrative Record (ECF No. 9).  The Court GRANTS Life Insurance Company of North America's Motion to Strike Plaintiff's Reply (ECF No. 15).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of September, 2019